# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XENON INVESTMENT CORPORATION, et al.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>UNITED STATES LIABILITY INSURANCE COMPANY, et al.,<br><br>                    Defendants. | Case No. 2:24-cv-04630-MRA-AGR<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [ECF 38] AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [39]** |

Before the Court are Defendants' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (the "Motion"), ECF 38, and Plaintiffs' Motion for Partial Summary Judgment (the "Cross-Motion") (collectively, the "Motions"), ECF 39. The Court has read and considered the moving, opposing, and reply papers in connection with both Motions and held a hearing on August 11, 2025. ECF 50. The Motions raise the same fundamental question: whether Defendants, as insurers, owe Plaintiffs a duty to defend and indemnify them in two underlying lawsuits pursuant to several property managers professional liability insurance policies. For the reasons stated herein, the Court finds that they do not and therefore **GRANTS** Defendants' Motion and **DENIES** Plaintiffs' Cross-Motion.

## I.      BACKGROUND

This insurance coverage case arises out of two underlying state lawsuits brought by non-party IH Investments, LLC ("IH") against Plaintiffs, alleging Plaintiffs committed fraud and breached their fiduciary duties in connection with investment transactions for the financing and co-ownership of multiple properties. *See generally* ECF 19.  Plaintiffs Rohit Mehta ("Rohit") and Deepak Mehta ("Deepak") own and operate Plaintiff Xenon Investment Corporation, LLC ("Xenon"). *Id.* ¶¶ 3–4, 11, 14.  Through Xenon, Plaintiffs own and manage multiple residential apartment complexes, some of which were insured by Defendants United States Liability Insurance Company ("USLIC") and Mount Vernon Fire Insurance Company ("MVFIC"). *Id.* ¶¶ 11, 14, 17.  Xenon is a parent company to a fully owned subsidiary, Westside Habitats, LLC ("Westside"), which manages the properties at issue in the underlying lawsuits. *Id.* ¶¶ 34, 40–41.

### A.      Factual Background[1]

The Court addresses the relevant insurance policies, the underlying actions, and the denial of coverage in turn.

---

[1] Unless otherwise indicated, the facts set forth in this section are taken from Defendants' Statement of Uncontroverted Facts, Plaintiffs' Statement of Uncontroverted Facts, Plaintiffs' Statement of Genuine Disputes of Material Fact, Defendants' Statement of Genuine Disputes of Material Fact, Defendants' Response to Statements of Genuine Dispute, or Plaintiffs' Response to Statements of Genuine Dispute.  ECF 38-1; ECF 39-2; ECF 40-1, ECF 41-1, ECF 42-1, ECF 43-1.  District courts are not required to make findings of fact on a motion for summary judgment.  Fed. R. Civ. P. 52(a)(3).  Instead, the court "may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the Statement of Genuine Disputes and (b) controverted by declaration or other written evidence filed in opposition to the motion."  C.D. Cal. L-R 56-4; *see also* Fed. R. Civ. P. 56(c).  The Court has reviewed and considered all evidence in the record, including declarations and documentary evidence.  The parties filed several evidentiary objections and responses to objections in connection with the Motions. *See, e.g.*, ECF 40-3; ECF 40-4; ECF 42-3; ECF 42-4.  To the extent the Court relies on objected-to evidence, the relevant objections are overruled.

### 1. The Policies

Plaintiffs obtained three property managers professional liability insurance coverage policies from Defendants (two from MVFIC and one from USLIC) (collectively, the "Policies"): (1) Policy No. PM 2551072 (the "2020 Policy"), issued from MVFIC to Westside and effective May 10, 2020, to May 10, 2021; (2) Policy No. PM 2551072A (the "2021 Policy"), issued from MVFIC to Westside and effective May 10, 2021, to May 10, 2022; and (3) Policy No. PM 1555900 (the "2022 Policy"), issued from USLIC to Westside and effective May 10, 2022, to May 10, 2023. ECF 43-1 ¶¶ 1–3; ECF 39-5 ¶¶ 2–4, Exs. A–C. Though initially the 2022 Policy was extended into 2023, USLIC cancelled it on July 6, 2023, at Plaintiffs' request. ECF 41-1 ¶ 21.

Plaintiffs worked with Hanasab Insurance Services ("Hanasab") and Gateway Underwriters Agency ("Gateway") when obtaining the Policies. ECF 43-1 ¶¶ 5, 68–75. The Policies utilized the same coverage form for the insuring agreement and provided Plaintiffs with "Property Managers Professional Liability Errors and Omissions" coverage of up to $1,000,000 per claim, which was also the total annual aggregate, subject to a $5,000 deductible. *Id.* ¶ 7; ECF 39-5 ¶ 2, Ex. A ¶ III(A) at A-10; *id.* ¶ 3, Ex. B ¶ III(A) at B-48; *id.* ¶ 4, Ex. C ¶ III(A) at C-8. While procuring the 2021 Policy, Plaintiffs explained to Defendants (through Hanasab and Gateway) the details regarding their ownership of various entities. ECF 43-1 ¶¶ 68–75; ECF 39-5 ¶ 14, Ex. M. On May 10, 2021, Plaintiffs sent USLIC a Corporate Structure Organizational Chart (through Hanasab and Gateway) indicating Xenon owned the majority of Westside (as well as the Dorchester Properties, LLC ("Dorchester"), BG Apartments LLC ("BG"), and VTM Apartments, LLC ("VTM")), and that Rohit and Deepak owned Xenon through irrevocable trusts. *Id.* In addition, Plaintiffs sent the following email to Defendants (through Hanasab and Gateway):

> Per the agent: Please see below the full Corporation Structure and let me know the carrier[']s response:
>
> - Two brothers Rohit and Deepak Mehta are the ultimate shared owners via their 2 Trusts that own the Corporate Structure

- Most of the apartment buildings are either owned in majority by Xenon Investment Corp. or via its underlying LLC
- In all cases, the Management Company within the Corporate Structure, Westside Habitats LLC, manages each apartment building
- Most of the apartment buildings (95%+) are ultimately owned and managed by Rohit and Deepak Mehta - There is a very small percentage of buildings that are third party owned (by friends and family).

*Id*. On May 11, 2021, an USLIC agent responded that USLIC was "not able to add all the names but everyone under Xenon Investments gets automatic AI ["Additional Insured"] status in the form since they are the names of the properties managed."  ECF 43-1 ¶ 71; ECF 39-5 ¶ 14, Ex. M.

The relevant provisions of the Policies are as follows:

*First*, the Policies state in relevant part that they apply to only (1) the Named Insured, which both parties agree is Westside, ECF 43-1 ¶ 8; (2) "any past or present partner, officer, director, trustee, managing agent or employee of [Westside]," but only "solely while providing Professional Services on behalf of [Westside]"; and (3) "any entity for which [Westside] has agreed to provide Professional Services."[2]  The Policies further state that "such entity will only be considered an Insured under this Policy for Claims arising solely out of Wrongful Acts of the entity or individuals [also explicitly covered by the Policies]." ECF 39-5 ¶ 2, Ex. A ¶ III(E) at A-20; *id.* ¶ 3 Ex. B ¶ III(E) at B-58; *id.* ¶ 4, Ex. C ¶ III(E)

---

[2] The exact language of the Policies is as follows (including emphases):

**"Insured"** means: (1) the **Named Insured**; (2) any past or present partner, officer, director, trustee, managing agent or employee of the **Named Insured**, solely while providing **Professional Services** on behalf of the **Named Insured**; [or] (4) any entity for which the **Named Insured** has agreed to provide **Professional Services**.  However, such entity will only be considered an **Insured** under this Policy for Claims arising solely out of **Wrongful Acts** of the entity or individuals stated above in Definition E (1), (2) and (3).

ECF 39-5 ¶ 2, Ex. A ¶ III(E) at A-20; *id.* ¶ 3 Ex. B ¶ III(E) at B-58; *id.* ¶ 4, Ex. C ¶ III(E) at C-92.

-4-

at C-92.  The 2022 Policy modifies this latter language to apply more narrowly to "Wrongful Acts of the Named Insured," *i.e.,* Westside, as opposed to "Wrongful Acts of the entity or individuals [also explicitly covered by the Policies]."  *Id.* ¶ 4, Ex. C ¶ III(E) at C-112.

*Second*, the Policies provide that the Insurers will pay on behalf of the Insured losses due to claims made against the Insured during the policy period, or any extension of the policy period, for "wrongful acts" of the Insured "arising solely out of an Insured's duties on behalf of [Westside]."[3]  The policy period is defined as "the period from the effective date of the Policy to the Policy expiration date as stated in the Declarations, or its earlier cancellation or termination date, if any."  *Id.* ¶ 2, Ex. A at A-20; *id.* ¶ 3, Ex. B at B-58; *id.* ¶ 4, Ex. C at C-92.

*Third*, the Policies include an "Additional Insured Endorsement" for Xenon but only with "respect to claims arising out of any negligent act, error or omission in the rendering or failure to render **Professional Services** by any individual or entity of [Westside]

---

[3] The exact language of the Policies is as follows (including emphases):

A.  The **Company** will pay on behalf of the **Insured Loss** in excess of the Deductible not exceeding the Limit of Liability to which this coverage applies that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or if applicable, during any Extension Period, for **Wrongful Acts** of an **Insured** arising solely out of an **Insured's** duties on behalf of the **Named Insured**.

B.  The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent.  The **Company** may investigate any **Claim** and settle any **Claim** with the **Insured's** consent as the **Company** deems expedient, but the **Company** is not obligated to pay any damages or defend any **Claim** after the Limit of Liability has been exhausted by the payment of **Loss**.

ECF 43-1 ¶ 13; ECF 39-5 ¶ 2, Ex. A ¶ I(A–B) at A-19; *id.* ¶ 3, Ex. B ¶ I(A–B) at B-57; *id.* ¶ 4, Ex. C ¶ I(A–B) at C-91.

specified in Item I of the Policy."  ECF 39-5 ¶ 2, Ex. A at A-29; *id.* ¶ 3, Ex. B at B-67; *id.* ¶ 4, Ex. C at C-101 (emphasis in original).[4]

*Fourth*, Exclusion I of the Policies excludes, *inter alia*, loss in connection with any claim resulting from "the rendering or failure to render Professional Services by any Insured as an employee, owner, partner, stockholder, trustee, director or officer of any sole proprietorship, partnership, or corporation or other business enterprise other than the Named Insured."  ECF 41-1 ¶ 22; ECF 39-5 ¶ 2, Ex. A ¶ V(I) at A-21; *id.* ¶ 3, Ex. B ¶ V(I) at B-59; *id.* ¶ 4, Ex. C ¶ V(I) at C-93.

The following terms, as defined in the Policies, are relevant to the instant Motions:

> "**Claim**" [means] (1) a demand for money as compensation for a **Wrongful Act**; or (2) any judicial or administrative proceeding initiated against any **Insured** seeking to hold such **Insured** responsible for a **Wrongful Act**, including any appeal therefrom.

> "**Wrongful Act**" means any actual or alleged negligent act, error or omission of an **Insured** arising solely from the rendering or failure to render **Professional Services**.[5]

> "**Professional Services**" means services performed by the **Insured** in the **Insured's** capacity as a property manager or leasing agent.

ECF 39-5 ¶ 2, Ex. A ¶ III(B, J, M) at A-19–20; *id.* ¶ 3, Ex. B ¶ III(B, J, M) at B-57–58; *id.* ¶ 4, Ex. C ¶ III(B, J, M) at C-91–92 (emphases in original).  The terms "property manager" and "leasing agent" are not explicitly defined in the Policies.

---

[4] The 2021 and 2022 Policies also include an "Additional Insured Endorsement" for "Consolidated Capital Realty Inc" with the same parameters as applied to Xenon.  ECF 39-5 ¶ 3, Ex. B at B-68; *id.* ¶ 4, Ex. C at C-102.

[5] The 2022 Policy adds the following to the definition of "Wrongful Act": "**Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or that are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events shall be deemed to be one **Wrongful Act** and to have commenced at the time of the earliest **Wrongful Act**."  ECF 39-5 ¶ 4, Ex. C at C-112 (emphases in original).

*Finally*, the Policies include a "Retroactive Date Endorsement" provision, stating that the Insurer shall not provide coverage for:

> **Loss** or **Claims Expenses** [**Defense Costs**] in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Wrongful Act** [or a **Wrongful Act** resulting in **Personal Injury**] committed, or alleged to have been committed prior to 05/10/2020.

ECF 39-5 ¶ 2, Ex. A at A-28; *id.* ¶ 3, Ex. B at B-66; *id.* ¶ 4, Ex. C at C-100 (emphases in original).[6]

### 2. The Underlying Actions[7]

An investor in Plaintiffs' properties, IH, filed two separate lawsuits against Plaintiffs (the "Underlying Actions") in state court. *See* ECF 41-1 ¶¶ 1-17. IH filed the first case on

---

[6] The 2022 Policy includes slightly different language, included here in brackets, and adds: "Or, in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any matter, fact, or circumstances disclosed in connection with the matter, fact, or circumstance outlined below: 5/10/2020." ECF 39-5 ¶ 4, Ex. C at C-100 (emphases in original). "Claims Expenses" is not defined in the Policies, but "Defense Costs" is defined as:

> reasonable and necessary legal fees and expenses incurred by an attorney designated by the **Company** to defend the **Insureds** and all other fees, costs, costs of attachment or similar bonds (but without any obligations on the part of the **Company** to apply for or furnish such bonds) and expenses incurred by the **Company** resulting from the investigation, adjustment, defense and appeal of a Claim, but does not mean salaries, wages, overhead or benefits expense of **Insured**.

*Id.* ¶ 2, Ex. A at A-20; *id.* ¶ 3, Ex. B at B-58; *id.* ¶ 4, Ex. C at C-92 (emphases in original).

[7] The parties request that the Court take judicial notice of court filings in the Underlying Actions. *See* ECF 38-4; ECF 39-3. Federal Rule of Evidence 201 "permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)-(2)). "[P]roceedings in other courts,

-7-

March 17, 2022, *IH Investments, LLC v. Dorchester Properties, LLC, et al.*, Los Angeles County Superior Court, Case No. 22STCV09471 (the "Dorchester Action"), and the second case on December 19, 2022, *IH Investments, LLC v. VTM Apartments, LLC, et al.*, Los Angeles County Superior Court, Case No. 22STCV39298 (the "VTM Action"). *Id.* ¶¶ 1, 9. Westside is not a named party in either case. *Id.* ¶¶ 8, 17.

In the Dorchester Action, IH sued BG Apartments LLC, Xenon, Rohit, and Deepak ("Dorchester Defendants"), alleging IH provided the Dorchester Defendants with approximately $5.5 million in loans to invest in six of their multi-family property acquisitions.[8] ECF 42-1 ¶¶ 1–3; ECF 38-4, Ex. 16 ¶ 17. As part of a written agreement between the parties, IH purchased a 12% interest in Dorchester for $500,000, which the Dorchester Defendants then used to fund the purchase of a 45-unit residential building. ECF 38-4, Ex. 16 ¶¶ 18, 21. IH later learned that the Dorchester Defendants had misrepresented the actual price of the building at the time of investment. *Id.* ¶ 36. As a result, on October 8, 2015, IH gave notice it was exercising a buyout option contained in their agreement, but the Dorchester Defendants delayed the buyout, which then never occurred. *Id.* ¶¶ 26, 29, 35. Beginning in June 2015, the Dorchester Defendants claimed that IH did not own an interest in Dorchester, even though IH was reflected in Dorchester's K-1 tax filing that year and received its *pari passu* share of the proceeds from refinancing the property. *Id.* ¶ 23. The Dorchester Defendants allegedly emailed IH falsified K-1 documents in 2016, showing that IH had zero ownership interests in Dorchester. *Id.* ¶ 32. During this period, there were also two refinancing agreements (April 28, 2017, and April

---

both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue," fit squarely within this description. *Trigueros v. Adams*, 658 F. 3d 983, 987 (9th Cir. 2011). Accordingly, the Court takes judicial notice of all the requested documents.

[8] Plaintiffs argue that Defendants paraphrase, misstate, and omit certain allegations pertaining to the Underlying Actions. *See* ECF 41-1 ¶¶ 4, 6-7, 14-16. Yet Plaintiffs do not explain what exactly Defendants misconstrue and instead refer the Court to the relevant paragraphs in the Underlying Actions. *See id.* The Court has reviewed the complaints in the Underlying Actions and independently summarizes the claims herein.

-8-

30, 2020) from which IH has not received its full distribution. *Id.* ¶ 37. The Dorchester Defendants stopped sharing accounting documents with IH in 2016. *Id.* ¶ 30. In 2021, the Dorchester Defendants eliminated IH's interest without an accounting or buyout. *Id.* ¶ 31.

IH makes similar allegations in the VTM Action, in which it sued VTM, Xenon, BG, BG2 Apartments LLC, Rohit, and Deepak ("VTM Defendants"). ECF 42-1 ¶¶ 9–17. Specifically, IH alleges that it provided the VTM Defendants also with approximately $5.5 million in loans to invest in six of their multi-family property acquisitions, and gained a membership share in VTM and BG in exchange for its investments. ECF 38-4, Ex. 18 ¶¶ 22-24. IH alleges that VTM Defendants filed tax returns reflecting an improper reduction of IH's ownership in both VTM and BG, purportedly to decrease the value of IH's interest so VTM Defendants could buy out IH's interests at reduced percentages. *Id.* ¶¶ 28-33, 41. Rohit and Deepak also allegedly misrepresented the purchase price of certain properties and the amount of equity VTM Defendants put into VTM, thus causing IH to be denied refinancing distributions it would have received had its interest been calculated correctly. *Id.* ¶¶ 42-46.

### 3. The Denial of Coverage

On June 27, 2022, Plaintiffs sought coverage under the Policies for the Dorchester Action, which USLIC denied on July 5, 2022. USLIC provided the following reasons for its denial of coverage:

> (1) the allegations of the Dorchester Action did not arise from an alleged negligent act, error or omission by Westside in the provision of Professional Services; (2) the allegations of the Dorchester Action did not concern any property management services IH received from Westside; (3) Exclusion I applied because the allegations of the first amended complaint in the Dorchester Action concerned the actions of BG, Xenon, and/or Dorchester rather than Westside; and (4) the allegations of the first amended complaint in the Dorchester Action were barred by the Retroactive Date Endorsement because various certain allegations predated the May 10, 2020 retroactive date.

ECF 42-1 ¶ 31.  Plaintiffs sought reconsideration, clarifying that the 2021 Policy with MVFIC may be at issue, rather than the 2022 Policy with USLIC, but MVFIC also denied coverage, noting "coverage was limited to claims resulting from an error or omission on the part of Westside in the provision of Professional Services as a property manager or leasing agent." *Id.* ¶ 32.  On May 3, 2025, Plaintiffs sent Defendants a letter tendering the claims in the VTM Action and arguing for coverage under the Policies.  *Id.* ¶ 110. Defendants did not respond.  *Id.* ¶ 111.  On June 18, 2024, Plaintiffs followed up regarding their claim for coverage of the VTM Action and, again, Defendants failed to respond.  *Id.* ¶ 112.  Plaintiffs have never received a response from Defendants to their tender of those claims.  *Id.* ¶ 113.

### B.     Procedural History

On May 1, 2024, Plaintiffs initiated the instant action in Los Angeles County Superior Court.  ECF 1, Ex. 1.  On June 3, 2024, Defendants removed the action to federal court based on diversity jurisdiction.  ECF 1.  On October 3, 2024, Plaintiffs filed the First Amended Complaint ("FAC"), asserting claims for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraud/misrepresentation; (4) violations of California Business & Professions Code §§ 17200, *et seq.* (the "UCL"); and (5) declaratory judgment/insurance coverage.  ECF 19.[9]  On May 2, 2025, Defendants moved for summary judgment or, in the alternative, partial summary judgment.  ECF 38.  Shortly thereafter, on May 5, 2025, Plaintiffs cross-moved for partial summary judgment.  ECF 39.  The Court addresses the Motions together given the parties' overlapping issues and arguments.

## II.     <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate where the movant has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Entry of

---

[9] Plaintiffs omit a fourth cause of action in the FAC, skipping from the third cause of action to the fifth cause of action.  Thus, although the last cause of action is listed as the "sixth," the FAC includes only five causes of action.

judgment is appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Material facts are those which may affect the outcome of the case." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008); *Anderson*, 447 U.S. at 248. "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Long*, 442 F.3d at 1185; *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Cartrett*, 477 U.S. 317, 323 (1986). Where the moving party does not bear the burden of proof at trial, it need only show that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met this initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc). The court must grant summary judgment for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255); *Groh v. Ramirez*, 540 U.S. 551, 562 (2004). However, "facts must be viewed in the light most favorable to the nonmoving party only if" the dispute as to those facts is "genuine." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). A plaintiff's claims do not survive summary judgment where merely a "scintilla of evidence" supports them. *Anderson*, 477 U.S. at 252. Rather, "there must be evidence on which the

[fact finder] could reasonably find for the plaintiff." *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (requiring more than a "metaphysical doubt" to establish a genuine dispute of material fact).

## III.  DISCUSSION

Plaintiffs' five causes of action all hinge on whether they were entitled to coverage under the Policies for the Underlying Actions.  If the Policies do not cover the Underlying Actions, there is no duty to defend or to indemnify the Insured and, for the reasons explained below, Plaintiffs' claims necessarily fail as a matter of law.

### A.  Insurance Coverage Principles

In California, "interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992).  "[T]he mutual intention of the parties at the time the contract is formed governs interpretation." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867 (1993) (citing Cal. Civ. Code § 1636).  "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.*  (citing Cal. Civ. Code § 1639).  "If the policy language 'is clear and explicit, it governs.'" *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999) (quoting *Bank of the W.*, 2 Cal. 4th at 1264); *see also* Cal. Civ. Code § 1638.

When interpreting a policy provision, courts "must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Palmer*, 21 Cal. 4th at 1115, (citations and quotations omitted); *see also* Cal. Civ. Code § 1644.  "The terms must also be interpreted 'in context' and give effect 'to every part' of the policy with 'each clause helping to interpret the other.'" *Palmer*, 21 Cal. 4th at 1115 (internal citation omitted) (quoting *Bank of the W.*, 2 Cal. 4th at 1265; Cal. Civ. Code § 1641).

"Where a policy term has been judicially construed, it is not ambiguous." *McMillin Homes Constr. Inc. v. Nat'l Fire & Marine Ins. Co.*, 35 Cal. App. 5th 1042 (2019) (citing

*Cnty. of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 423 (2005)). "[T]he judicial construction of the term should be read into the policy unless the parties express a contrary intent." *Bartlome v. State Farm Fire & Cas. Co.*, 208 Cal. App. 3d 1235, 1239 (1989). This rule of insurance policy interpretation, however, is to be applied "with caution, first determining whether the context in which the construed term appears is analogous to the context of the term before [it]." *Lockheed Corp. v. Continental Ins. Co.*, 134 Cal. App. 4th 187, 197 (2005).

Courts interpreting contracts will ensure the contract is "given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates." *Rsrv. Ins. Co.*, 30 Cal. at 807–08 (citing *Harris v. Glens Falls Ins. Co.* 6 Cal. 3d 699, 701 (1972)). In the insurance context, "coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer." *Id.* at 808 (citing *State Farm Mut. Auto. Ins. Co. v. Partridge* 10 Cal. 3d 94, 101-102 (1973)). However, "[a] policy provision is ambiguous *only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." *Id.* "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *Bay Cities Paving*, 5 Cal. 4th at 867 (quoting *Rsrv. Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 807 (1982)).

### B.    Interpretation of the Policies

Defendants argue that they were not required to defend or indemnify Plaintiffs in the Underlying Actions because: (1) Plaintiffs do not qualify as Insured under the Policies with respect to the claims asserted against them in those actions; (2) the Underlying Actions do not fall within the Policies because they do not allege any "Wrongful Acts" as defined therein; (3) the acts and omissions alleged in the Underlying Actions also do not arise *solely* out of Plaintiffs' duties on behalf of Westside, as required by the Policies; (4) to the extent the Underlying Actions involve any professional services at all, the allegations relate to Plaintiff's acts and omissions on behalf of entities other than Westside, thereby barring coverage pursuant to Exclusion I; (5) the Policies' Retroactive Date Endorsement precludes

coverage because the alleged wrongful acts in the Underlying Actions were committed prior to May 10, 2020; and (6) any failure to respond to Plaintiffs' tender cannot create liability where it did not previously exist.  ECF 38 at 16–17; ECF 42 at 17-18.  Plaintiffs disagree on all fronts, arguing that coverage did exist and at a minimum the terms of the Policies raise triable factual issues that should not be resolved on summary judgment.  ECF 41 at 14–25.

The Court finds that there are two essential provisions in the Policies that compel summary judgment in favor of Defendants regardless of whether the specific Plaintiffs—as opposed to Westside—are insured under the Policies.  First, the Policies cover wrongful acts arising solely from the rendering or failure to render professional services, which encompass traditional property management or leasing services—not the financing and purchase of residential properties or the management of an investor's funds and financial interest at issue in the Underlying Actions.  Second, the Policies' coverage period does not extend to claims relating to conduct committed or alleged to have been committed by Plaintiffs prior to May 10, 2020.  It is undisputed that the core allegations in the Underlying Actions relate to conduct committed before that date.

### 1.    *Professional Services*

To begin, the parties agree that the Policies cover Westside as the "Named Insured," and that Westside is Plaintiffs' fully owned subsidiary.  ECF 41-1 ¶ 54.  Plaintiffs argue that each of them is also insured under the Policies, and that the Policies' plain language does not require that Westside be a named party to the Underlying Actions for coverage to exist.  ECF 41 at 14–16.  Assuming *arguendo* that Plaintiffs are insured under the Policies, there is also no dispute that they are entitled to coverage ***only if*** the acts and omissions alleged in the Underlying Actions involve "professional services" under the Policies.  *See* ECF 43-1 ¶ 13; ECF 39-5 ¶ 2, Ex. A at A-19-20; *id.* ¶ 3, Ex. B at B-57-58; *id.* ¶ 4, Ex. C at C-91-2 (explaining Insurer will indemnify Insureds for Wrongful Acts and defining Wrongful Acts as "any actual or alleged negligent act, error or omission of an Insured arising solely from the rendering or failure to render Professional Services") (emphases

-14-

omitted).  Thus, the Court must interpret this term in the agreement to determine whether there is potential for coverage.

"Professional Services" are defined in the Policies as "services performed by the **Insured** in the **Insured's** capacity as a property manager or leasing agent.  **Professional Services** shall also mean services provided on or via the **Insured's** internet, e-mail telecommunication or similar system by the **Insured** in the **Insured's** capacity as a property manager or leasing agent."  ECF 39-5 ¶ 2, Ex. A, ¶ III(J) at A-20; *id.* ¶ 3, Ex. B, ¶(III)(J) at B-58; *id.* ¶ 4, Ex. C, ¶III(J) at C-92 (emphases in original).  As previously noted, the terms "property manager" and "leasing agent" are not defined in the Policies.  *See* ECF 38 at 19; ECF 39-1 at 19.  For this reason, Plaintiffs contend that the terms are ambiguous and should be construed in favor of coverage.  ECF 41 at 16.  Defendants disagree and argue that the terms, interpreted in their ordinary and popular sense, do not extend to investment transactions for the financing and co-ownership of multiple properties at issue in the Underlying Actions.  *See* ECF 38 at 19 (citing Cal. Civil. Code § 1644).

The Court agrees that the fact that the Policies do not define "property manager" or "leasing agent" does not automatically mean that the terms are ambiguous.  *See Bay Cities Paving*, 5 Cal.4th at 866; *Bank of the W.*, 2 Cal.4th at 1264-1265.  The terms are ambiguous only "if [they are] susceptible to two or more reasonable constructions despite the plain meaning of [their] terms within the context of the policy as a whole."  *Palmer*, 21 Cal. 4th at 1115; *see also* Cal. Civ. Code § 1644.

Neither party provides the Court with a California case construing the policy terms "property manager" or "leasing agent."  Defendants, however, provide evidence from multiple sources to help define "property manager" in its ordinary and popular sense.  *See* ECF 38 at 11–13 (providing definition of property manager from Wikipedia, Investopedia, Rocket Mortgage, and Indeed.com).  For example, Defendants explain that:

> A property manager may arrange for a wide variety of services, as may be requested by the owner of the property, for a fee.  Where a dwelling (vacation home, second home) is only periodically occupied, the property manager might arrange for heightened security monitoring, house-sitting, storage and

shipping of goods, and other local subcontracting necessary to make the property comfortable when the owner is in residence (utilities, systems operating, supplies and staff on hand, etc.).  Property management can also include commercial properties where the property manager may run the business and manage the property.  Some jurisdictions may require a property manager to be licensed to practice the profession.

ECF 41-1 ¶ 36.[10]

Despite their contention that the Underlying Actions involve allegations concerning their omissions or actions as "property managers," Plaintiffs present no alternative definition of the term "property manager."  Instead, they argue that they had a reasonable expectation that the Policies would cover claims related to their property management business given that Defendants were made aware of Rohit's and Deepak's roles as property managers and their ownership of various entities, including Xenon and Westside, during the insurance application process.  ECF 41 at 17.  While these facts may speak to the interrelated nature of the entities owned and operated by Rohit and Deepak and suggest that Plaintiffs had a reasonable expectation that the Policies would extend *to the various entities*, Plaintiffs fail to draw a connection between the interrelatedness of their companies and the "professional services" traditionally attributed to "property managers."  In other words, even if Plaintiffs had a reasonable expectation that they were covered as insured

---

[10] Defendants also provide a list of duties typical of leasing agents gathered from Indeed.com.  ECF 38 at 20.  These duties include meeting with prospective tenants and providing them with tours of the property, preparing and executing lease documents, negotiating lease renewals, and other tasks associated with liaising between property owners and tenants to fill vacancies.  *Id.*  Plaintiffs do not provide a competing definition of "leasing agent" and, more important, they do not argue or present evidence that the Underlying Actions arise from their conduct as leasing agents.  Rather, they center their argument on Rohit and Deepak's status as "property managers."  *See* ECF 39-1 at 19; ECF 41 at 17; ECF 43 at 9.  Accordingly, the Court's analysis is focused only on whether Plaintiffs' alleged conduct in the Underlying Actions falls within the definition of "property manager."  Any argument that Plaintiffs acted as leasing agents with respect to the Underlying Actions is waived.

-16-

parties, they cannot show that the term "property manager" is susceptible to any other definition than the one provided by Defendants.

Importantly, "California state courts have uniformly held that insurance policies covering 'professional services' reach only those acts committed by the insured in his or her capacity as a professional—they do not cover general administrative activities that occur in all types of businesses." *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 766 (9th Cir. 2005), *opinion amended on denial of reh'g*, No. 03-15728, 2005 WL 553004 (9th Cir. Mar. 10, 2005). "Professional Services" are those "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill is predominantly mental or intellectual, rather than physical or manual." *Hollingsworth v. Com. Union Ins. Co.*, 208 Cal. App. 3d 800, 807 (1989). Additionally, insurance for professional services does not extend to services not contemplated by that specific profession. *See, e.g., Blumberg v. Guarantee Insurance Co.*, 192 Cal. App. 3d 1286, 1297 (1987) (holding professional malpractice insurance does not cover a lawsuit between attorneys over an alleged breach of their partnership agreement since plaintiff was acting in his capacity as a law partner, not as an attorney rendering services); *Transamerica Insurance Co. v. Sayble*, 193 Cal. App. 3d 1562, 1569 (1987) (holding professional malpractice insurance did not cover litigation expenses arising from an attorney's alleged mismanagement of a law firm). When determining what may be deemed a "professional service" in any given industry, a court should consider "all the relevant circumstances in which that claim arises, including, but not limited to, the term's commonly understood meaning, the type and cost of the policy, and the nature of the enterprise." *Hollingsworth*, 208 Cal. App. 3d at 806.

The Policies, when read in their entirety, clearly provide coverage for traditional property management (and leasing) services and not for managing investments or procuring financing for those properties. As an initial matter, the Policies specifically reference day-to-day property management services and include, for example, a "Lock Box Coverage Endorsement" and a "Mold, Fungus, Bacteria, Virus And Organic Pathogen

-17-

Exclusion." ECF 39-5 ¶ 2, Ex. A at A-33, A-40; *id.* ¶ 3, Ex. B at B-71, B-78; *id.* ¶ 4, Ex. C at C-105, C-120. In addition, there are several exclusions in the Policies that the parties do not address even though they provide important context. For example, Exclusion D bars coverage for any claims relating to an Insured's representations pertaining to the value of real property; Exclusion G bars coverage of "disputes involving . . . any personal profit or advantage to which the Insured is not legally entitled"; and Exclusion R bars coverage of claims involving "any dishonest, fraudulent or criminal act or omission or deliberate misrepresentation committed by, at the direction of, or with the knowledge of any Insured." *Id.* ¶ 2, Ex. A at A-21-22; *id.* ¶ 3, Ex. B at B-59-60; *id.* ¶ 4, Ex. C at C-93-94 (emphases omitted).[11] While the Court does not consider these exclusions as separate grounds for the denial of coverage (since Defendants do not rely on them), the exclusions nonetheless show that the Policies were meant to exclude claims outside the scope of traditional property-management services.

Thus, the Court's reading of the Policies in their entirety is consistent with Defendants' interpretation that the Policies provide coverage for traditional property management services—*i.e.,* the management of the "day-to-day operations of a rental property," such as "finding tenants and handling maintenance requests." ECF 42 at 6, 8. Similar policies evaluated by California courts confirm the ordinary and popular meaning of the term "property manager." *See, e.g., MKB Mgmt., Inc. v. Melikian*, 184 Cal. App. 4th 796, 799 (2010) (reviewing responsibilities of a property manager as defined in a

---

[11] In the 2022 Policy, Exclusion G was deleted in its entirety and replaced with the following: "Disputes involving an **Insured's** fee or charges, any personal profit or advantage to which the **Insured** is not legally entitled, or the actual or alleged failure or inability to pay or collect premium escrow or tax money or the actual or alleged conversion, misappropriation, comingling or defalcation of funds or other property." ECF 39-5 ¶ 4, Ex. C at C-112 (emphases in original). Exclusion R was also deleted in the 2022 Policy and replaced with the following: "Any actual or alleged dishonest, fraudulent or criminal act or omission or deliberate misrepresentation committed by, at the direction of, or with the knowledge of any **Insured**." *Id.* at C-113 (emphasis in original).

-18-

contract for property management services, including "to advertise rentals; sign, renew, and cancel leases; collect rents and other charges; terminate tenancies and sign notices on behalf of the owner; prosecute unlawful detainer actions; cause repairs and alterations to be made; decorate the premises; purchase supplies; hire and supervise employees to operate and maintain the premises; and contract with others for services on behalf of the owner"); *Essex Marina City Club, L.P. v. Cont'l Cas. Co.*, No. 11-408 SC, 2011 WL 1753906, at *3 (N.D. Cal. May 9, 2011) (describing an insurance policy that defines "property manager" as a "'person' providing services 'in connection with the management of commercial or residential property,'" including services such as "solicitation, evaluation and securing tenants and management of tenant relations, collection of rent, and processing evictions").

The cases cited by Plaintiffs in support of their contention that the allegations in the Underlying Actions are related to "professional services" attributed to a "property manager" are inapposite.  The courts in those cases determined that obtaining investments or financing can qualify as "professional services" when the services are provided by financial institutions whose day-to-day business inherently involves financing—not traditional property management.  *See PMI Mortg. Ins. Co.*, 394 F.3d at 764  (finding the policy issued to a large financial institution covered an alleged kickback scheme and the resulting action because "professional services" were defined broadly in the policy as "those services of the Company permitted by law or regulation rendered by an Insured . . . pursuant to an agreement with the customer or client"); *Bank of California, N. A. v. Opie*, 663 F. 2d 977, 982 (9th Cir. 1981) (applying Washington law and holding that the responsibility to manage loan proceeds was clearly part of a mortgage-banking business's day-to-day operations and therefore was a "professional service" within the meaning of the policy); *Isaacs v. Chartis Specialty Ins. Co.*, 12 F. Supp. 3d 1256, 1259-61, 1266-67 (S.D. Cal. 2014) (establishing wealth management company was covered for negligence and breach of fiduciary duty claims relating to plaintiffs' failure to provide independent financial advice resulting in detrimental loss of investment under a policy where "professional services" were defined as "economic advice, financial advice, or investment

advisory services" rendered "in connection or incidental to 'the purchase or sale of securities, including investment companies'"); *In re C.M. Meiers Co., Inc.*, 527 B.R. 388, 397-98, 400-01 (Bankr. C.D. Cal. 2015) (finding officers' allegedly dishonest and fraudulent maintenance of debtor's insurance trust account was a "professional service" because it is a statutorily required professional service for an insurance agent and broker under California law).

The Court agrees with Defendants that "Plaintiffs are attempting to conflate property management and management of a business that owns property, but these are not the same thing." ECF 40 at 8. The allegations in the Underlying Actions relate to the financing and purchase of residential properties, as well as the management of an investor's funds and financial interest. Specifically, IH alleges that Plaintiffs misrepresented the purchase price of multiple properties, declined to buy out its interests pursuant to the parties' agreement, withheld distributions owed to it, restricted its access to accounting documents, falsified tax documents, and reduced or eliminated its interest without an accounting or buyout. *See generally* ECF 38-4, Exs. 16, 18. These allegations do not arise from the day-to-day management of the properties.

Nevertheless, Plaintiffs argue that the liabilities in the Underlying Actions "arise out of the special risks inherent in the practice of property management" and are thus included in the scope of "Professional Services." ECF 43 at 12. In support of this argument, Plaintiffs point to the use of the term "property manager" in reference to Plaintiffs in the Underlying Actions, which purportedly demonstrates that the alleged conduct was carried out in Plaintiffs' role as property managers. ECF 41 at 17. However, "[i]n determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but of the act itself." *Opie*, 663 F.2d at 981. IH alleges Plaintiffs Rohit and Deepak owed fiduciary duties to it in their capacity as "fellow members" of Dorchester, VTM, and BG2, and that they breached those duties in connection with their investment transactions, financing, and ownership of the properties. ECF 38-4, Ex. 16 ¶ 61; *id.*, Ex. 18 ¶ 56.

Plaintiffs also cite language from the agreements at issue in the Underlying Actions, which provide that "[Xenon/BG] shall have the power and authority to engage the services of a property manager for the Property, who or which shall render such property management services as are customarily rendered by property managers of comparable properties in the geographical areas in which the Property is located." ECF 41 at 13. Though the agreements indicate that Rohit would initially serve as the property manager of the Property, ECF 41 at 11, the conduct alleged in the Underlying Actions simply does not relate to his duties as a "property manager."

It is axiomatic that "[w]hile the primary concern is to protect an insured's reasonable expectation of coverage, . . . an insurer 'has a right to limit the coverage of its policy and when it has done so the plain language of the limitation must be respected.'" *Hollingsworth*, 208 Cal. App. 3d at 808 (citations omitted). Here, the Court finds "no ambiguity in the policy . . . nor any basis for finding a reasonable expectation" that the conduct at issue in the Underlying Actions would be covered by the Policies. *Id.* at 810. Plaintiffs may have articulated a reasonable expectation that the coverage would generally extend to them and the various entities they own and operate in connection with Westside, but they failed to identify a genuine issue as to whether the conduct in the Underlying Actions arises from the rendering of or failure to render "professional services" as "property managers." *See Bay Cities Paving*, 5 Cal. 4th at 867 (declining to "adopt a strained or absurd interpretation in order to create an ambiguity where none exists"). Therefore, the Court holds that Plaintiffs are not entitled to coverage for the Underlying Actions under the Policies.[12]

---

[12] The Court's determination regarding "Professional Services" resolves several of the parties' other disputes. For example, Plaintiffs and Defendants also disagree over the definition of "Wrongful Act," but conduct can qualify as a "Wrongful Act" only if it is "arising solely from the rendering or failure to render Professional Services." As the Underlying Actions do not relate to "Professional Services" as defined in the Policies, Plaintiffs cannot have been said to have committed a "Wrongful Act." Similarly, whether the "Professional Services" were provided solely on the behalf of Westside is now a moot question.

### 2. *Retroactive Endorsement Date*

Even if the Policies covered the parties *and* the conduct alleged in the Underlying Actions, the Court finds that the Policies' Retroactive Endorsement Date independently precludes coverage. As stated above, the Policies state:

> In consideration of the premium paid, it is agreed that the Company shall not be liable to make any payment for **Loss or Claim Expenses** in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Wrongful Act** [or a **Wrongful Act** resulting in **Personal Injury**] committed, or alleged to have been committed prior to 05/10/2020.[13]

ECF 39-5 ¶ 2, Ex. A at A-28; *id.* ¶ 3, Ex. B at B-66; *id.* ¶ 4, Ex. C at C-100 (emphases in original).

It is undisputed that IH asserted claims against Plaintiffs relating to conduct dating prior to May 10, 2020. *See* ECF 38-4, Exs. 16, 18. In the Underlying Actions, IH alleged it invested in entities owned by Plaintiffs in 2011 and 2012 for the purpose of purchasing multi-family residences. ECF 38-4, Ex. 16 ¶¶ 18-19; *id.*, Ex. 18 ¶¶ 23-24. IH later learned that Plaintiffs had misrepresented the actual price of various properties at the time of investment. *Id.*, Ex. 16 ¶ 36; *id.*, Ex. 18 ¶¶ 42-45. On October 8, 2015, IH gave notice of its intent to exercise a buyout option, but Dorchester Defendants delayed the buyout, which never occurred. *Id.*, Ex. 16 ¶¶ 26, 29, 35. Beginning in 2016, Plaintiffs allegedly falsified tax documents and failed to share accounting documents with IH. *Id.*, Ex. 16 ¶¶ 32, 78; *id.*, Ex. 18 ¶ 28. IH purportedly did not receive any distributions from two refinancing agreements executed on April 28, 2017, and April 30, 2020. *Id.*, Ex. 16 ¶ 37. In 2021, Dorchester Defendants improperly eliminated IH's membership interest. *Id.* ¶ 31. In 2022, VTM Defendants offered to buy out IH's interest at a reduced percentage and did not respond to IH's request for VTM Defendants to purchase the accurate percentage. *Id.*, Ex. 18 ¶¶ 35-36.

---

[13] The text of the 2022 Policy includes slightly different language, included here in brackets. *See* ECF 39-5 ¶ 4, Ex. C at C-100.

Nevertheless, Plaintiffs argue the Policies provide coverage for the Underlying Actions because they are both "Claims" under the Policies and were first brought to Plaintiffs attention when they were filed after May 10, 2020. ECF 41 at 20–24. The arguments here are the same as those asserted by the parties in *Emerson Equity, LLC v. Forge Underwriting Ltd.*, 707 F. Supp. 3d 900 (N.D. Cal. 2023), which both parties examined in their papers. In *Emerson*, the court found in favor of the insured due to the ambiguity of the policy language excluding "[l]oss in connection with any [c]laim, including any [i]nterrelated [w]rongful [a]ct(s) occurring prior to [a specified date.]" *Id.* at 907. The *Emerson* court determined there were two reasonable constructions of this provision: (1) coverage was precluded for claims filed prior to the retroactive date; or (2) coverage was precluded for both claims filed prior to the retroactive date and claims related to a wrongful act predating the retroactive date but filed afterwards. *See id.* Because the provision at issue did not state that coverage was precluded for any "any claim *arising from* any interrelated wrongful act," the court held that "the provision could reasonably be interpreted as barring only claims filed before the retroactive date." *Id.* at 908 (emphasis in original).

Here, the Policies include broader and clearer language than that at issue in *Emerson*. The Insurer is not obligated to make payment for loss or claim expenses in connection with any claim "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a Wrongful Act committed, or alleged to have been committed prior to 05/20/2020." ECF 39-5 ¶ 2, Ex. A at A-28; *id.* ¶ 3, Ex. B at B-66; *id.* ¶ 4, Ex. C at C-100 (emphasis omitted). Moreover, the word "committed" unambiguously ties the conditional timing to when the "Wrongful Act" occurred or was alleged to have occurred, not when the claim was filed. Indeed, a "Wrongful Act" is "any actual or alleged negligent act, error or omission of an Insured  arising solely from the rendering or failure to render Professional Services," not a cause of action. *Id.* (emphases omitted).

//

//

-23-

As such, the Court interprets this provision to unambiguously bar the claims for the Underlying Actions because it is undisputed that the alleged conduct underlying the claims predates the retroactive endorsement date for coverage.

### 3. *Defendants' Failure to Respond to Plaintiffs*

Plaintiffs also contend that, because Defendants failed to respond to their tender in the VTM Action, they waived their right to assert late tender and other putative defenses. ECF 41 at 24-25. Defendants concede that they failed to respond to Plaintiffs but argue that failure to respond to an insured's tender where no coverage exists does not create an insurer's obligation to the insured. ECF 42 at 13.

The Court agrees with Defendants. Plaintiffs are not entitled to an equitable defense to create coverage where it did not previously exist. *See Aetna Cas. & Sur. Co. v. Richmond*, 76 Cal. App. 3d 645, 653 (1977) ("The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom . . . ."); *Waller*, 11 Cal. 4th at 33 ("A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed").[14]

//

//

//

---

[14] Plaintiff cites to *Zumbrun v. United Services Auto. Ass'n*, 719 F. Supp. 890 (E.D. Cal., 1989), in which the court found the insurer had waived its affirmative defenses by failing to specify them as reasons for denying the claim and allegedly raised them for the first time in its second amended answer. *Zumbrun* is factually distinguishable because, unlike here, the insurer in that case had responded to the insured's claim and, in evaluating whether the insured suffered a covered loss, the court found ambiguity in the meaning of the policy and established there was a triable issue of fact to be resolved by a jury, which is not the case here.

-24-

**C.    Plaintiffs' Claims**

Having now interpreted the key terms of the Policies and found that coverage does not exist in connection with the Underlying Actions, the Court resolves each of Plaintiffs' claims.

First, Plaintiffs' breach of contract claim fails because there is no genuine issue that Defendants breached the Policies.  Under California law, "the elements of a cause of action for breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citation omitted).  The existence of the Policies, and that Plaintiffs paid the premiums for the Policies are not in dispute.  ECF 42-1 ¶¶ 18-20; ECF 42 at 13.  The dispositive issue is whether Defendants breached the Policies by denying Plaintiffs coverage in the Underlying Actions.  ECF 38 at 2-3.  As explained above, Defendants properly denied Plaintiffs coverage, so there is no breach of the Policies.

Second, for the same reason, Plaintiffs' breach of the implied covenant of good faith and fair dealing fails because there is no potential coverage under the Policies for the Underlying Actions.  In the insurance context, the primary test for a breach of the implied covenant of good faith claim primarily tests "whether the insurer withheld payment of an insured's claim unreasonably and in bad faith." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990).  As such, a Plaintiff must show "(1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Id.*  Here, the Court has already held that no benefits were due under the Policies with respect to the Underlying Actions.  Thus, "if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." *Waller*, 11 Cal. 4th at 36 (citing *Love*, 221 Cal.App.3d at 1151–1153).

Third, Plaintiffs' fraud/misrepresentation claim fails because Plaintiffs have not

-25-

presented sufficient evidence in support of their claim. Under California law, the elements of a fraud claim are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of the falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004) (citing *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996)).

Plaintiffs argue that Defendants made fraudulent statements on which Plaintiffs relied in purchasing the Policies. ECF 41 at 27-28. Specifically, they assert that Defendants misrepresented the scope of coverage with respect to Plaintiffs' property management business and that Defendants would promptly investigate and process claims to determine coverage within a reasonable time after being notified of any claims. *Id.* As evidence in support of their claim, Plaintiffs offer Defendants' failures to respond to the tender of the VTM Action and to attend the mediations of the Underlying Actions. *Id.* But these actions clearly took place after the issuance of the Policies. Plaintiffs also fail to present any evidence in support of Defendants' knowledge of falsity or intent to defraud Plaintiffs. Accordingly, this claim fails as a matter of law.

Fourth, Plaintiffs' UCL claim cannot be sustained because Plaintiffs were not entitled to coverage, and where there is no coverage, the denial of a claim cannot constitute an unfair business practice. The UCL "prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011) (quoting Cal. Bus. & Prof. Code § 17200). Plaintiffs allege that Defendants committed unlawful, unfair, and fraudulent acts in violation of the UCL "by engaging in the acts and practices described in [the] paragraphs [detailing the previously mentioned claims,]" specifically via their "untrue and misleading misrepresentations regarding their policies' coverage." ECF 19 ¶ 105. An action based on the UCL to redress an unlawful business practice treats violations under other laws as independently actionable unlawful competition practices, *Farmers Ins. Exch. v. Super. Court*, 2 Cal. 4th 377, 383 (1992), but as explained above, Plaintiffs did not

establish a triable issue as to any unlawful or fraudulent conduct.  Accordingly, the UCL claim fails as well.  *See Wincor Nixdorf Inc. v. Discover Prop. & Cas. Ins. Co.*, No. CV1302772GAFFFMX, 2013 WL 12131718, at *4 (C.D. Cal. June 14, 2013), *aff'd*, 612 F. App'x 900 (9th Cir. 2015) (dismissing a UCL claim based on a failed breach of contract claim).

***

Because Plaintiffs cannot sustain any of their claims, the Court **GRANTS** summary judgment in favor of Defendants and against Plaintiffs on all claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [38] and **DENIES** Plaintiffs' Cross-Motion for Partial Summary Judgment [39].

Defendants shall lodge within **seven (7) days** of this Order a proposed judgment and order consistent with this Order to close this matter, since there are no other pending claims.

**IT IS SO ORDERED.**

Dated: March 31, 2026

MONICA RAMIREZ ALMADANI
UNITED STATES DISTRICT JUDGE

-27-